NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| EUGENIA K. EMMANOUIL and ANTHONY Z. EMMANOUIL | : | |
| Plaintiffs, | : | Civil No. 11-5575 (JAP) |
| v. | : | **OPINION** |
| MITA MANAGEMENT, LLC, et al., | : | |
| Defendant. | : | |

PISANO, District Judge.

This matter comes before the Court upon: (1) the motion for summary judgment filed by Mita Management, LLC, Michael Avallone, Community Check Cashing II LLC, AAA Community Check Cashing II, LLC, AAA Affordable Check Cashing, LLC, Check Cashing Station, LLC, AG Bailey Check Cash, LLC, Deerfield Funding, LLC (together, the "Mita Defendants") [ECF No. 114]; and (2) the motion for summary judgment filed by Callie Lasch Roggio ("Lasch") [ECF No. 116]. Plaintiffs, Eugenia K. Emmanouil and Anthony Z. Emmanouil (together, "Plaintiffs" or the "Emmanouils"), oppose these motions. The Court considers the parties' submissions without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons below, the Court denies these motions.

**I.    Background**

   A.   *Procedural Background*

After a jury trial in *Emmanouil, et al. v. Roggio, et al.*, Civil Action No. 06-1068 (the "Underlying Action"), Chief Judge Garrett E. Brown, Jr. entered a judgment on October 1, 2010 in the amount of $1,222,311 in favor of Anthony Emmanouil, Eugenia Emmanouil, and West Belt Auto Supply, Inc. and against Vincent Roggio ("Roggio"). On April 6, 2011, Chief Judge Brown

amended the judgment to include pre-judgment interest and legal fees, bringing the total amount to $1,945,119.  On January 30, 2013, the original judgment was amended again, bringing the total amount to $2,095,422.39 (the "Final Judgment").  On December 10, 2010, Roggio provided a response to Plaintiffs' information subpoena, in which he stated that he had no bank accounts in his name, his only income was $590 per month in social security benefits, and that the only real property he owned was located at: (1) 140 Rumson Road, Rumson, New Jersey; and (2) 467 Navesink Road, Red Bank, New Jersey (together, the "Roggio Properties").  Roggio never disclosed any open line of credit from Mita Management in his current assets or income on the information subpoena.

Plaintiffs requested and were granted additional discovery to locate the assets of Roggio pursuant to Fed. R. Civ. P. 69(a)(2).[1]  In the order granting post-judgment discovery, Judge Brown stated that "it appears . . . that [Vincent] Roggio has, for years, been funding most aspects of his life with approximately $2 million in total funds" transferred to Roggio by Michael Avallone and Mita Management, LLC.  Mita Management, LLC, owned by Michael Avallone, is a company that manages several check cashing stores.  Mr. Avallone, Mita Management, LLC, and several of these check cashing stores are also defendants in the instant action (together, the "Mita Defendants"). Judge Brown, therefore, granted discovery into the "apparently unusual relationship" between Vincent Roggio and the Mita Defendants.

B.   *Background Facts*

<u>The Mita Defendants – Roggio Relationship</u>

In 1998, two years after he declared for bankruptcy, Avallone entered into the check cashing business.  Avallone and Tara Avallone equally own Mita Management, LLC ("Mita" or "Mita

---

[1] Rule 69(a)(2) states: "In aid of the judgment or execution, the judgment creditor or a successor in interest whose interest appears of record may obtain discovery from any person—including the judgment debtor-as provided in these rules or by the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(2).

Management"). Mita is a management company for the twelve Check Cashing Defendants, each of which engages in the business of check cashing and Western Union wire transactions. Each Check Cashing Defendant pays Mita a management fee pursuant to a certain oral understanding. Mita pays all the bills on behalf of each check-cashing store owned by the Check Cashing Defendants, and also allocates its expenses to each Cash Checking Defendant. All profits of the Check Cashing Defendants remain in the respective entities. Neither Mr. Avallone nor Tara Avallone have made any capital contribution or loans to Mita since May 2007. Mita owns no other assets besides the cash it maintains in a checking account with First Atlantic, and has no line of credit or any other debt.

Mr. Avallone met Vincent Roggio for the first time in or around May 2007. The two men were introduced by Harold Goldman, Esq., an attorney who had represented them both. At the time of their meeting, Roggio was a defendant in at least five lawsuits relating to liens or lis pendens on the Roggio Properties. Roggio was also a defendant in the Underlying Action at the time of their introduction. On April 25, 2007, Sea Coast Family Chiropractic had secured a judgment against Roggio in the amount of $4,937.18.

In June 2007, at their initial meeting, Roggio asked Avallone for a $250,000 loan for Roggio's bankruptcy company, Gibraltar Granite Marble Corp. ("Gibraltar Granite"). Avallone agreed and loaned Roggio $250,000 for Gibraltar Granite. At the time Avallone agreed to make this loan to Roggio he had never loaned money to anyone other than family and friends of family. Roggio is not related to Avallone. Avallone also knew that Roggio's only source of income was his social security benefits, and he also knew about the pending lawsuits and judgments against Roggio and the Roggio Properties. Prior to making this loan to Roggio, whom he had met only a month earlier, Avallone claims that he did not review any books or records, conduct any background investigation into Roggio, or determine whether a bank or other entity holds a lien on the assets of

3

Gibraltar Granite. There is no document evidencing the loan, and Avallone did not know the interest rate of the supposed loan, its terms, or its maturity date. Roggio has not yet repaid any portion of this $250,000 loan.

At the time of this purported $250,000 loan request, Sovereign Bank, who lent money to Gibraltar Granite, declared its loan in default and commenced an action against Roggio and Gibraltar Granite. Sovereign Bank sought to, *inter alia*, foreclose on its first lien position. At the same time, Gibraltar Granite's landlord commenced an eviction proceeding against Gibraltar Granite. On January 3, 2008, Gibraltar Granite filed for Chapter 11 Bankruptcy, which was eventually converted to a Chapter 7. Gibraltar Granite did not identify Mita as a creditor and Mita did not file a proof of claim or take any other steps to protect its interests in the $250,000 purported loan provided to Gibraltar Granite.

After this initial $250,000 loan, Avallone continued to make purported loans to Roggio. After June 2007, when the initial loan was made, nine additional parties secured judgments against Roggio, in a cumulative amount totaling $7,679,221.14. From June 27, 2007 to February 18, 2011, Avallone, through Mita, wrote checks to or for the benefit of Roggio totaling $1,955,157.49. Additional funds were loaned to Roggio through April 2011 by Mita. Overall, the total amount provided to Roggio from Mita is approximately $2.3 million.

In 2009, Avallone opened a checking account in the name of Deerfield Funding, LLC (the "Account"). The Account was in the name of Roggio and Avallone, and Roggio and Avallone both had check signing privileges. Roggio had unfettered access to the funds in the joint account, which was open for over a year, from June 2009 to September 2010. During this time, Roggio had over $6 million in judgments against him.

This $2.3 million of funds were paid in any sum, at any time, at Roggio's sole discretion. The payments were made directly to Roggio and Lasch, as well as directly to third-parties for the

4

benefit of Roggio, such as for legal fees, electric and cable bills, landscaping bills, gas, and other expenses.  Neither Roggio nor Mita kept any invoices or documentation that was presented to Roggio for payment of expenses; the distributions made to Roggio were only noted on a piece of paper.  Until the entry of the restraints in this matter on December 14, 2011, Avallone never denied Roggio a request for the payment of money.  Roggio typically only cashed checks with the Check Cashing Defendants in amounts equal to or less than $10,000.00, apparently to avoid Federal reporting requirements.

Avallone has stated that the $2.3 million in purported loans was based on the strength of Roggio's pending lawsuits. Despite relying solely on these litigations for security, Avallone never read a pleading in any action where Roggio is a party, never read a brief, never monitored the status of any litigation other than occasionally speaking with Mr. Goldman, and has no idea what, if any, damages Roggio is claiming in any lawsuit.  At the time Avallone filed mortgages on the 140 Rumson Road property, these mortgages were essentially worthless given the number of superior holders and judgment creditors.  The Mita Defendants have never made a demand to Roggio for the repayment of the purported loans, and Roggio does not believe that his arrangement with Mita is a loan that will be repaid.  To date, Avallone has never filed a claim against either Roggio or Lasch.  Mita falsely reported on its tax returns and in its books and records that advances to and/or on behalf of Roggio are deductible business expenses of Mita.

As discussed, all of the funds provided to or on behalf of Roggio came from Mita.  Avallone did not provide any money from his personal accounts during this time period.  Avallone also has testified that he did not contribute any capital to Mita for Mita to use in transferring the purported loans to Roggio.  It is disputed whether or not Mita generated enough revenue to fund the transfers made to, or on behalf of Roggio.  In 2007, Mita's net revenue was $179,491.  In 2007, Mita provided $513,474 to Roggio.  In 2008, Mita had a net loss of $126,119.  In 2008, Mita provided

$283,426.86 to Roggio. Avallone could only blame this discrepancy on an unspecified accounting mistake at his deposition. *See* Deposition of Michael Avallone, July 24, 2013 ("Avallone Dep.") 55:5–56:8.

### The Sparling-Roggio Relationship

Robert Sparling is a chiropractor who lives in New Haven, New Jersey. He is the sole proprietor of his chiropractic practice. He has only one employee, his 90-year-old mother, who acts as his assistant. Sparling's sole source of income is that received from his chiropractic practice. He has no personal bank account, and all expenses are paid out of his business bank account.

Sparling is an acquaintance of the Roggio Defendants. Like Avallone, Sparling provided money to Gilbraltar Granite, in an amount of $150,000. As discussed, Gibraltar filed for bankruptcy in 2008. As a result of this bankruptcy, Sparling lost his entire investment in Gibraltar. Furthermore, as a result of his involvement with Gibraltar, the trustee in that bankruptcy case secured a judgment against Sparling in the amount of $113,334. Sparling met Avallone through Roggio, and visited his check cashing stores on more than one occasion. In 2009, Avallone loaned Sparling $70,000.

On January 23, 2009, as a result of his struggling chiropractic practice, Sparling filed a voluntary petition under Chapter 7 in the United States Bankruptcy Court for the District of New Jersey. In his bankruptcy schedule, Sparling identified his marital home and limited personal property as assets. Although Roggio and Lasch are identified on Schedule H of his schedules, Sparling did not identify either individual as owing any funds to Sparling or as creditors of his bankruptcy estate. He represented that his 2007 and 2008 incomes were $65,939 and $50,000, respectively.

Beginning in or about 2007 until some point in 2012, Plaintiffs assert that Roggio, Sparling, and Lasch engaged in a scheme wherein Roggio and Lasch washed funds with the participation of

Sparling. The facts have established that the Roggios would provide funds to Sparling in the form of cash or checks during various days in any particular month. On that same day, Sparling would deposit the funds in his business account at Commerce Bank and its successor TD Bank. Commerce/TD bank would immediately provide Sparling same day credit for the funds. On the day he received and deposited the funds into his bank account, Sparling wrote checks to Roggio, Lasch, himself, or to "cash." Sparling initially testified that this "arrangement" was based on his need for short-term cash to fund operating expenses for his chiropractic practice; however, as detailed below, Sparling eventually changed his testimony that he would take money from Roggio, put it into the account, and then write Roggio a check. Sparling states that he engaged in these transactions because he "was helping" Roggio. *See* Deposition of Robert Sparling ("Sparling Dep.") T75:10-77:9. Sparling received no consideration from Roggio for engaging in these transactions.

    In 2007 through 2008, Sparling's bank account yielded $85,750 based on same-day or close-in-time credits and debits through a combination of checks made out to Roggio, to cash, to Sparling (with an indiciation in the memo for Roggio) and withdrawals. In 2009 through 2010, Sparling's bank account yielded $62,700 based on similar transactions. In 2011 through 2012, Sparling's bank account yielded $170,079 based on the same.

    Sparling did not have income sufficient to fund the deposits into his account related to Roggio. Sparling's only source of income was his chiropractic practice, which had a gross income of between $6,000 and $8,000 a month during the relevant time period. After Sparling's expenses of $5,000 and $6,000 a month were taken into account, he had no more than $3,000 monthly (or $36,000 annually) to provide to Roggio. Sparling has stated that the only sources for deposits into his bank account were insurance receipts, co-pays from patients, and money from Roggio.

    During his deposition, Sparling changed his testimony, stating that the money he received from Roggio was not a loan. Rather, he would receive cash from Roggio and thereafter write him a

check for a similar amount.  In April 2011, Sparling deposited $47,000 into his account, even though he had said his best month, collection-wise, was approximately $13,000.  Sparling stated that he did not use the approximate $34,000-$35,000 for cash flow.  Sparling's monthly deposits and later-issued checks totaled about $35,000 a month, an amount that far exceeds his monthly income of $6,000-$8,000.  This approximately $35,000 provided by Roggio in April 2011 far exceeds Roggio's reported income of approximately $595 a month.

A review of Sparling's bank statements demonstrates that from 2008 through 2012, Sparling routinely deposited large cash amounts and, within a day (and usually the same day), wrote a check to Roggio for identical amounts.[2]  These transactions occurred during the trial in the Underlying Action.  Sparling was aware of the entry of the Judgment in the Underlying Action.  The transactions continued into 2011 and 2012, after this action was filed and Avallone was restrained from providing Roggio with any additional funds.  Sparling engaged in the same types of transactions with Lasch.

In 2011, Jane Murphy ("Murphy"), Sparling's mother and sole employee, received a reverse mortgage from Amboy Bank in the amount of $350,000.  Murphy, a 90-year-old woman, received the reverse mortgage to pay off a privately held mortgage of Defendant Avallone.  At the closing in August 2011, Avallone received approximately $100,000 from Sparling's mother.

Based upon post-judgment discovery and after being unable to secure payment of the Final Judgment, Plaintiffs filed this action on September 26, 2011.  Plaintiffs' Verified Complaint contains the following causes of action against the Defendants:  (1) concert of action (Count One); (2) conspiracy (Count Two); (3) debtor false oath to creditor (Count Three); (4) violation of N.J. Stat. Ann. § 2A:17–65 (Count Four); (5) constructive trust (Count 5); (6) unjust enrichment (Count

---

[2] As just two examples, on June 18, 2008, Sparling deposited $4,2000 and on June 19, 2008, he wrote a check for Roggio for $4,200.  On July 22, 2008, Sparling deposited $4,200.  On July 23, 2008, and on July 24, 2008, Sparling wrote two checks to Roggio totaling $4,200.

Six); (7) turnover (Count Seven); (8) declaratory judgment (Count Eight); (9) violation of N.J. Stat. Ann. § 25A:2–25(a) (Count Nine); (10) violation of N.J. Stat. Ann. § 25:2–27 (Count Ten); (11) New Jersey Rico (Count Twelve); and (13) conversion (Count Thirteen). The Mita Defendants and Defendant Lasch have moved for summary judgment.

## II.     Standard of Review

A court shall grant summary judgment under Rule 56 of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of establishing that that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. If the moving party makes this showing, the burden shifts to the non-moving party to present evidence that a genuine fact issue compels a trial. *Id.* at 324. The non-moving party must then offer admissible evidence that establishes a genuine issue of material fact, *id.*, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "To be material, a fact must have the potential to alter the outcome of the case" under governing law. *N.A.A.C.P v. North Hudson Regional Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson*, 477 U.S. at 249. For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual

dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *In re Lemington Home for Aged*, 659 F.3d 282, 290 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).  If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment.  *Big Apple BMW v. BMW of North America*, 974 F.2d 1358, 1363 (3d Cir. 1992).

**III.** **Analysis**

    A.    *The Mita Defendants' Motion for Summary Judgment*

The Mita Defendants seek summary judgment on all counts of Plaintiffs' Complaint.  The crux of Mita Defendants' summary judgment motion is that Plaintiffs have failed to prove that Roggio transferred any funds to Mita Management.  Mita Management argues that, because Plaintiffs' claims all require proof of a fraudulent transfer, summary judgment should be entered in their favor.

Stated simply, making all inferences in favor of Plaintiffs, there are myriad genuine issues of material fact that preclude the Court's entry of summary judgment.  The Court's review of the evidence presented, when viewed in a light most favorable to Plaintiffs, establish that there is a real issue of genuine fact as to what was the source of the funds for the money provided to Roggio.  Specifically, there is a genuine factual dispute as to whether the Mita Defendants had the ability to fund the payments to and on the behalf of Roggio.  It is undisputed that Mita Management is the sole source of the over $2 million provided to the Roggios.  Mita Management's tax records, however, reveal that the company did not make enough money to fund the payments it was making to the Roggios.  Avallone has blamed this discrepancy on an accounting mistake, but, viewing the evidence in the light most favorable to Plaintiffs, there is a genuine factual dispute about whether Mita could afford the payments it made to Roggio.  This dispute is essential to Plaintiffs' claims.

As they argue, the inability of Mita Management to fund the payments to Roggio means that the source of the payments came from someone else.  Until the disputed question of the source of the funds ultimately provided to Roggio is determined, the Court cannot grant summary judgment in favor of the Mita Defendants.

These disputed facts alone would be sufficient to deny summary judgment.  The circumstances surrounding the purported loans to the Roggios, however, highlight the inappropriateness of entering summary judgment at this stage.  As Plaintiffs have pointed out, there is a serious factual dispute regarding the consideration given to the Mita Defendants for the payment of over $2 million.  Plaintiffs have shown that, despite knowing Roggio for only a month, Avallone began providing purported loans to or on behalf of Roggio that eventually totaled over $2.3 million.  Avallone has asserted that the consideration for these loans was an interest in the pending lawsuits to which the Roggios were parties, because he believed that there was merit in these suits.  Plaintiffs, however, has supplied evidence that calls into question whether these loans were genuine. For example, Avallone started making these payments to Roggio without conducting any due diligence; Avallone never read a pleading in any action where Roggio is a party, never read a brief, never monitored the status of any litigation other than occasionally speaking with Goldman, and has no knowledge of any damages Roggio is claiming in any lawsuit.   Avallone never secured his interest in these lawsuits, and is at the back of a very long line of creditors with over $7 million in judgments against Roggio.  Avallone has never otherwise sought repayment of these purported loans, and Roggio has even stated that he has no intention of repaying Avallone.  This evidence establishes that there is not only a factual dispute regarding the "consideration" provided to Avallone and the Mita Defendants, but also provides some further context to the alleged fraudulent nature of the obligations incurred by Roggio.

The Mita Defendants have also asserted that Plaintiffs have failed to supply any proof of a conspiracy between Roggio and Avallone. The Court disagrees. Plaintiffs have provided enough evidence to provide a triable issue of fact regarding the existence of a conspiracy between Roggio and Avallone to undertake a fraudulent obligation of loans totaling $2.3 million. Under New Jersey law, there are two relevant inquiries to determine whether a transfer constitutes a fraudulent conveyance:

> The first is whether the debtor [or person making the conveyance] has put some asset beyond the reach of creditors which would have been available to them at some point in time but for the conveyance. The second is whether the debtor transferred property with an intent to defraud, delay, or hinder the creditor. Transfers calculated to hinder, delay, or defeat collection of a known debt are deemed fraudulent because of the debtor's intent to withdraw the assets from the reach of process.

*Jecker v. Hidden Valley, Inc.*, 422 N.J. Super. 155, 163–64 (App. Div. 2011) (quoting *Gilchinsky v. Nat'l Westminster Bank N.J.*, 159 N.J. 463, 475–76 (1999)) (alternation in original).

Here, despite the arguments of the Mita Defendants, there is enough evidence to create an issue of fact with regards to whether Avallone and Roggio intended to "defraud, delay, or hinder" the creditors of Roggio by placing the property of the Roggios beyond the reach of the credits. First, as detailed above, there is the suspect circumstances surrounding the nature of the purported loans between Avallone and Roggio. As Plaintiffs have pointed out, the nature of the purported loans generally raises an issue regarding the legitimacy of the loans, which were not provided to Roggio in a lump sum amount or installment payment. Rather, Roggio was provided with an open-ended credit line. Next, a substantial amount of the funds provided to Roggio were paid directly to third-parties, keeping such funds out of the reach of creditors. Further, Avallone formed a new entity, Deerfield Funding, LLC, and opened a bank account in its name. Then, instead of depositing money directly to the Roggios' bank account, Avallone provided access to the funds of this account to himself and Roggio. Finally, Plaintiffs have provided evidence establishing that the Roggios were washing money through the bank account of Sparling. The funds provided to Sparling came

from an unknown source. Sparling himself did not have income sufficient to fund the deposits into his account related to Roggio. Likewise, the money that Roggio provided to Sparling, which totaled approximately $35,000 in April 2011 alone, far exceeded Roggio's monthly reported income of approximately $590 a month. As Plaintiffs argue, if the Roggios legitimately held these funds, there would be no reason to provide it to Sparling for a same-day or next-day check cut to Roggio from Sparling's account. While the Mita Defendants have argued that, because Avallone has never tried to collect on the purported loan from Roggio, there is no evidence of any attempt on their behalf to "hinder" a creditor. This argument not only strengthens Plaintiffs' assertion that the purported "loan" between Roggio was not actually a loan at all, but also is too literal an interpretation of how a defendant can "hinder" a creditor. A reasonable jury could find that the Roggios, acting in concert with the Mita Defendants, undertook a sham "obligation" of over $2.3 million in loans, providing no consideration, that were paid in a manner specifically directed at avoiding creditors and otherwise hiding assets. As such, making all inferences in favor of Plaintiffs, the Court cannot grant summary judgment in favor of the Mita Defendants.

   B. *Defendant Lasch's Motion for Summary Judgment*

Under Local Rule 56.1(a), a party moving for summary judgment "shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion." L. Civ. R. 56.1(a). A motion for summary judgment that is not accompanied by a statement of undisputed facts "shall be dismissed." *Id.*; s*ee also Owens v. Am. Hardware Mut. Ins. Co., et al.*, 2012 U.S. Dist. LEXIS 182953, at \*5–6 (denying plaintiff's motion for summary judgment because plaintiff failed to provide a statement of undisputed material facts along with his motion).

Here, Defendant Lasch's motion lacks any compliance with Local Rule 56.1(a).  Her motion consists only of her Memorandum of Law and two attached exhibits.  Lasch's brief itself provides no citations to the record and appears to rely on evidence that is not, in fact, part of the record in front of this Court, leaving the Court unable to verify several of the facts that she is relying on.  The Court is mindful of the fact that Lasch is a *pro se* litigant, and district court judges have, on occasion, relaxed certain procedural rules, including Local Civil Rule 56.1(a), for an unrepresented litigant. *See, e.g., Jordan v. Allgroup Wheaton*, 218 F. Supp. 2d 643, 646 (D.N.J. 2002), *aff'd*, 95 F. App'x 462 (3d Cir. 2004).  Lasch, however, is far from the common unrepresented litigant.  Lasch and Roggio are parties to lawsuits, both pro se and represented by counsel, throughout the United States.  The Roggios are well-versed in the procedures for summary judgment motions, as they have filed similar motions in prior related lawsuits.  For these reasons alone, Defendant Laschs's motion must be denied.[3]

## IV.   Conclusion

For the foregoing reasons, the summary judgment motions brought by the Mita Defendants and Callie Lasch Roggio are denied.  An appropriate Order accompanies this Opinion.

/s/ Joel A. Pisano  
JOEL A. PISANO, U.S.D.J.

Dated:  September 23, 2014

---

[3] Further, even if the Court were to consider Lasch's motion, as discussed in regards to the Mita Defendant's summary judgment motion, there are simply too many factual disputes at this point that preclude the entry of summary judgment.

14